IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ROBERT TATUM, and all similarly situated
DOC/CCI Inmates,

                            Plaintiff,                           OPINION AND ORDER

    v.                                                      13-cv-44-wmc

MICHAEL MEISNER and CATHY JESS,

                        Defendants.

      While incarcerated by the Wisconsin Department of Corrections ("DOC"), plaintiff Robert Tatum requested a nutritionally adequate diet in line with the Nation of Islam ("NOI") diet espoused in Elijah Muhammad's book, *How to Eat to Live*.  When this was denied him, Tatum filed this civil action under 42 U.S.C. § 1983, alleging that defendants Michael Meisner and Cathy Jess, both DOC employees, violated his and similar inmates' rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-2(b).

      Before the court now are the parties' cross motions for summary judgment.  (Dkt. ##50, 57.)  For the reasons that follow, the court will deny plaintiff's motion in its entirety, while granting defendants' motion for summary judgment as to plaintiffs' First Amendment claim only.  While defendants are entitled to judgment on that claim at least on grounds of qualified immunity, Tatum's RLUIPA claim requires a trial to resolve disputed material facts as to:  (1) whether Tatum has made a *prima facie* case that the denial of a NOI diet substantially burdened his religious exercise; and (2) whether that denial was the least restrictive means of furthering a compelling government interest.

Since the only remedies available to Tatum under RLUIPA are equitable in nature, the court will schedule a bench trial on this remaining claim following a status conference.

UNDISPUTED FACTS[1]

### A.  The Parties

Robert Tatum is an inmate who was confined at DOC's Columbia Correctional Institution ("CCI") from August 9, 2011, to May 8, 2014.[2]  Defendant Michael Meisner is currently employed by DOC as Warden at Redgranite Correctional Institution, but was the Warden at CCI throughout the period of Tatum's incarceration there.  Defendant Cathy Jess is the Administrator for DOC Division of Adult Institutions ("DAI"), just as she was from 2011 through 2014.

### B.  DOC's Accommodation of Religious Diets

DAI Policy #309.61.03 states that DAI "shall make religious diets available through standard menu alternatives as resources permit for inmates whose religious beliefs require the adherence to religious dietary laws."  (Defs.' PFOFs (dkt. #59) ¶ 4 (quoting Willard-West Aff., Ex. 101 (dkt. #60-2) p.1).)  The DAI religious diet menus

---

[1] Unless otherwise noted, the court finds the following facts to be material and undisputed based on the parties' submissions.

[2] Tatum is now housed at a different DOC institution, but as long as he continues to be imprisoned by DOC, his claims are not moot given his challenge to a DOC-wide policy, not a specific policy unique to CCI.  *See West v. Grams*, No. 14-3623, 607 F. App'x 561, 566 (7th Cir. Apr. 22, 2015) (unpublished) ("[T]hough a prison transfer might moot a claim for injunctive relief if the transfer means that the inmate no longer is laboring under the allegedly unconstitutional policy or practice, that is not the case here.  West's lawsuit challenges under RLUIPA a system-wide Department of Corrections policy that applied at Columbia, still applies at Green Bay, and—unless modified—will apply wherever West is next sent until his release.").

are constructed to allow inmates to abstain from religiously-prohibited foods, but do not necessarily provide preferred, traditional or culturally-significant foods.

In practice, this means that DOC inmates may request a special diet if their personal religious beliefs require that they abstain from foods offered as part of an institution's general menu. For example, inmates who identify as Jewish may request a kosher diet, and inmates who identify as Muslim may request a halal diet. If an inmate's religious beliefs require, he or she may also request a plant-based diet. In addition, inmates of any faith may choose fare from the general menu and simply self-select to avoid certain foods for religious reasons, just as other inmates may do so for secular reasons, such as personal taste or health, or no reason at all.

More particularly, the DOC religious diet menus are carefully structured by DAI registered dieticians to ensure adequate nutrition within the strictest religious adherence expectations. For example, a halal diet contains certified halal meats and scale fish, but does not include non halal-certified meats, eggs and milk, even though some Muslim adherents may find the non-halal certified options acceptable under their personal beliefs. Also, for a kosher diet, the meals are prepared offsite according to strict kashrut rules, even though some Jewish inmates may not follow that tenant of a kosher diet. Finally, the plant-based diet is a vegan diet, even though an inmate whose religious beliefs require a vegetarian diet would generally be open to eating dairy.

For religious meals, DAI policy allows for plant-based, halal and kosher options, but does not allow for further "individualized" menus, like a Nation of Islam ("NOI") diet, as opposed to further individualization by self-selection.[3]

In addition to providing religious accommodations, DOC is required to provide nutritious foods for all inmates. Menus are developed by central office food management staff and committees, including DOC dieticians, to ensure that meals are nutritionally sound, within budgetary restrictions. DOC dieticians post the menu at CCI. Institutions are allowed to provide two signature meals per week (i.e., institution favorites) but otherwise strive to make minimal tweaks to the scheduled menu (e.g., to accommodate product availability). At the time of Tatum's diet requests, the standard DOC diet provided approximately 2700 to 2900 calories per day, which was greater than the 2600 calorie daily value requirements (based on a reference male and USDA standards), allowing inmates to obtain sufficient calories even while declining to consume some items. From DOC's perspective, its religious menus, therefore, provide adult inmates with sustenance that is not religiously objectionable. In contrast, Tatum contends that the provision of a religious diet *necessarily* encompass preferred, traditional or culturally-significant foods. Tatum further contends that the DOC (and DAI, specifically) does not accommodate his NOI diet. While defendants agree in their reply that an NOI diet is not a menu option inmates can select, they also contend that Tatum can choose from a

---

[3] Tatum does not directly dispute this fact, but points out there *are* other individualized diets, including "no gluten," "hi-protein," and "six small feedings." (Pl.'s Resp. to Defs.' PFOFs (dkt. #65) ¶ 8.) While defendants explain those diets are for medical, not religious, purposes, this is at least an indication that additional menus can be and are offered by defendants.

general fare diet, halal diet or plant-based diet -- all of which contain a surplus of calories -- and can then "self-select" his preferred foods.

Tatum, however, contends, albeit without further explanation or proof, that he "could not get adequate calories and nutrition eating the standard DOC diet and adhering to his rel[igious] diet restrictions."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #65) ¶ 45.)[4]

### C.  Tatum's Religious Diet Accommodation Request

On July 6, 2011, Tatum submitted a "Request for New Religious Practice" form, DOC-2075, seeking accommodation of a religious diet with the following main requirements:

> 1. Eat 1 complete meal a day, not 3 partial meals, between 4pm-6pm.  2.  No pork, no un-kosher meat (I'm a vegetarian so I don't eat meat at all.) or un-kosher fish - fish is not meat, tuna or salmon, etc. is edible as long as it is from a fish under 50 lbs.  Eggs or butter is edible.  3. Navy beans, l[e]nt[i]ls, string/green beans and green peas are the only edible beans and peas (with nav[y beans] being highly regarded).  4.  No bleached items like breads (wheat is required).  No canned items (fresh fruit, etc. is required).   These are considered unclean for human consumption.  Little or no soy are advised to avoid soy and eat nav[y beans] for protein etc.  No un-natural items or process, like 0% milk.  (100% milk = edible)

---

[4]  Defendants also maintain that inmates can supplement their diets through canteen foods, though as plaintiff correctly points out, the canteen is not free and DOC does not provide extra funds to supplement an inmate's diet for religious reasons.  Nor do defendants offer proof that items available in the canteen could adequately supplement Tatum's dietary needs without violating dietary restrictions under his NOI beliefs.

(Willard-West Decl., Ex. 3 (dkt. #60-3) 1.)  Tatum explained that the diet was defined in *How to Eat to Live* (Vol. 2) by Elijah Muhammad, as well as the Book of Leviticus in the Bible and the Quran.  (*Id.*)

Consistent with DOC policy, the Chaplain and the Supervisor reviewed Tatum's request.  Both recommended that it be denied.  Religious Practices Coordinator for DOC Kelli Willard-West also reviewed the request and recommended denial, explaining that as a Muslim, Tatum has the opportunity to participate in the halal or vegan religious diets, or he could self-select from a general or one of the religious food trays.  (Willard-West Aff., Ex. 102 (dkt. #60-3) 2-3.)  Based on these recommendations, defendant Meisner also denied Tatum's request for reasons set forth by Willard-West.[5]

### D.  Nation of Islam Diet

According to Tatum, the Nation of Islam "was founded on the premise that Allah (God) taught Elijah Muhammad for 3 1/2 years, including a diet regimen, to teach Black persons in North Am[erica] as part of a religious conversion."  (Pl.'s PFOFs (dkt. #65) ¶ 11 (citing Tatum Aff. (dkt. #66) ¶¶ 1-2).)  Plaintiff further contends that these diet restrictions are stated in *How to Eat to Live*, Volumes I and II.  (Tatum Aff. (dkt. #66) ¶ 1.)

---

[5] Tatum submitted the same request again on February 7, 2012.  (Willard-West Aff., Ex. 103 (dkt. #60-4).)  After the Chaplain, Supervisor, and Willard-West again recommended denial, Meisner denied this request as well for the same reasons as the first denial.  Tatum submitted yet another request on May 15, 2014, which was also denied by the same people and for the same reasons.  (Willard-West Aff., Ex. 112 (dkt. #60-5).)  In addition, Tatum filed various offender complaints or grievances about the denial of his religious diet accommodation, but the court need not recount these since defendants do not argue that Tatum failed to exhaust his administrative remedies.  (Defs.' PFOFs (dkt. #59) ¶¶ 37-44, 56-58).)

Defendants' challenge these proposed facts on the basis that Tatum's affidavit lacks sufficient foundation, while Tatum explains in his affidavit that he has been an adherent of NOI religious beliefs for over 20 years, and has studied its principles, literature and eating.  (*Id.*)  The court finds his affidavit is a sufficient basis for Tatum to describe its basic tenets.

According to Tatum, Muhammad "instructs that eating according to the methods he teaches in his books is a <u>must</u> with his followers, constituting a religious mandate from a religious leader to follow the dictates of a religious diet.  This is no different, Tatum argues, than Musa (Moses) stating Allah (God) taught him the religious diet given to the Children of Israel."  (*Id.*)  Tatum further maintains that "maintaining religious purity of mind and body via diet restrictions is an important and obvious religious tent," and that he "strictly adhere[s] to NOI diet restrictions as Allah provided to the best of [his] ability, to achieve and maintain religious purity."  (*Id.* at ¶ 2.)

### E.  Unique Features of Correctional Food Service Operations

The parties dispute whether Tatum is seeking an individualized menu (or even requested individualization) and, of course, the implication that an entirely new individualized NOI menu might or might not have on the institution, especially to the extent it might invite other inmate requests for preferred meals that would have to be accommodated for religious reasons.  The court will address these disputes in its discussion below.  The following undisputed overview of the DOC's food services operations is simply offered for context.

DOC kitchens are set up for bulk high efficiency meal service, with thousands of meals produced daily in its institutional-style kitchens 365 days per year. Unlike correctional food service operations, restaurant cooking provides a wide variety of foods to individual customers based on patron food preferences and personal spending, with kitchens designed for this purpose, using small scale equipment and receiving multiple food deliveries each day from multiple vendors. Correctional cooking, in contrast, provides a limited selection of foods to an extremely large population generally using large scale equipment and food delivered less frequently and in larger proportions. Moreover, DOC food services are required to use only approved ingredients, recipes and menus. Perhaps most important, the food budgets are quite restricted. For fiscal year 2015 as an example, the DOC budgeted approximately $1.03 per meal.

Obviously, such large-scale and low cost food production requires careful planning to avoid both food shortages, on the one hand, and waste, on the other. Food suppliers require several weeks of lead time to supply new products. For this reason, DOC's 28-day menu uses only 150 ingredients, and CCI and other institutions purchase supplies in bulk sizes, not in individualized portions or even individualized meals. Deliveries arrive much less frequently than in a restaurant setting, from every one to four weeks, and virtually all supplies come from a single vendor.

In particular, CCI's kitchen is not equipped to prepare individualized meals. For example, the kitchen lacks cook tops, fry pans or sauce pans to prepare individualized portions. All meals, instead, are prepared in large mixers, 100-gallon steam-jacketed kettles, and combi-therm ovens. The CCI kitchen also has no extra storage or

preparatory space.  Having been designed to accommodate food preparation for 450 inmates, it now serves food for 830 inmates.  With increasingly rapid employee turnover and security concerns, including supervising the inmate cooks, defendants further contend that it is difficult, if not impossible, to take on anything new or complex.

Even more particular, inmate food workers prepare food according to approved menus, with specific assignments.  As a result, there is little or no time for these workers to prepare individualized meals, nor for supervising non-inmate workers to do so, given the other demands of their jobs.  When an inmate has a special diet ordered by medical staff, such as low sodium or high protein, approved tweaks are made to the food that is being served that day, but defendants maintain that "individualized meals are not prepared for those inmates."  (Defs.' PFOFs (dkt. #59) ¶ 27.)  Still, Tatum contends that a high protein diet requires just as much individualization as the NOI diet he is requesting.

Finally, with respect to accommodating Tatum's request for only one meal per day between 4:00 p.m. and 6:00 p.m., defendants contend that institution activities are carefully synchronized with any deviation likely to disrupt the entire institution. Accommodating Tatum's request would specifically require kitchen staff to prepare individualized portions, serve it, retrieve it and dispose of any leftovers.  CCI does not have the available time, staffing or resources to accommodate this type of request, and any transfer of resources necessary to meet this requirement would necessarily harm safety and security efforts for which those assets are currently being used.  Tatum

disputes this, however, by pointing out that dinner service typically occurs during the time requested.

There are also broader security concerns within the institution's accommodating individual meal and diet requests. Specifically, if Tatum received special food at a different time than other inmates, this would likely be viewed by other inmates as special treatment, and may be met with hostility, verbal threats and abuse and physical confrontation, threatening his safety and security. Tatum contends that this is an exaggeration, especially in light of the fact that he is neither seeking special foods (*e.g.*, foods that are not already in the possession of the DOC), nor at a special time, because dinner is already passed between 4:00 p.m. and 6:00 p.m.

### F. Scope of Religious Diet Requests

As further context, there are approximately 22,000 inmates incarcerated in Wisconsin, with approximately 359 receiving religious diet accommodations. In support of their claim that it would be impossible to accommodate individualized religious diets, DOC's Religious Practice Coordinator Willard-West also represents that Wisconsin inmates have requested the following preferred foods to tailor their own individualized religious diets: only organic foods; only raw whole foods; only all natural, non-processed foods; foods containing no salt; foods without soy additives; wild game such as elk, deer and buffalo; other unusual meat requests, such as horse, goat, eagle, and boar; roast beef on Wednesdays; meat plus fish on Fridays; beef or pork at every meal; and hot breakfast rather than cold cereals.

As a result, defendants contend that granting Tatum his request would "open the door for other inmates to make similar requests." (Defs.' PFOFs (dkt. #59) ¶ 69.) In addition to the difficulty (if not impossibility) of accommodating these various requests, at least on a regular basis, defendants maintain that they are also concerned about favoring certain religious, in violation of the establishment clause and equal protection clause.

### G. Nutritional Adequacy of Tatum's Requested Nation of Islam Diet

In January 2012, DOC dietician Christine Berndt-Miles nevertheless performed a nutritional analysis of the specific diet Tatum requested, along with a review of the cited publication *How to Eat to Live*. Based on her analysis, Berndt-Miles determined that the diet was nutritionally inadequate with regard to calories, thiamine, riboflavin, niacin, vitamin B6, vitamin B12, pantothenic acid, vitamin D, calcium, iron, magnesium, phosphorous, and potassium. Specifically, Berndt-Miles created a seven-day meal plan based on permitted foods from the teachings of *How to Eat to Live*. Assuming Tatum ate all of the food in the menu, he would still average only 1,019 calories per day. (Berndt-Miles Aff., Ex. 113 (dkt. #61-5).)

Tatum disputes these finding, arguing that Berndt-Miles' study failed to include certain foods, like tuna. (Tatum Aff. (dkt. #66) ¶ 17.) He also cites to two PBS shows discussing the health benefits of diets similar to that espoused in *How to Eat to Live*. (*Id.*)

11

### H. Nutritional Adequacy of Ramadan Meals

As part of his claim, Tatum also challenges the nutritional adequacy of the Ramadan meals already offered by DOC.  As best as the court can discern, Tatum's Ramadan-specific claim concerns defendants' refusal to accommodate his NOI diet during Ramadan, rather than somehow involving an independent challenge.  Still, the court will set forth facts specific to Tatum's Ramadan diet.

For the years relevant to Tatum's claims, DOC dieticians have developed menus in advance for all three diets (general, plant-based, and halal) for use during the month of Ramadan.  These menus are designed to provide sufficient calories and nutrients in the most economical manner by a combination of protein, carbohydrates, vegetables, fruit, dessert and milk.  Tatum disputes that the vegan or plant-based menu provides the minimum recommended daily allowance of essential fats and proteins.  (Pl.'s Resp. to Defs.' PFOFs (dkt. #65) ¶ 72 (citing Berndt-Miles Aff., Ex. 106 (dkt. #61-3) 15-21).)  As defendants explain in reply, the 2011 Ramadan menu for the plant-based diet varied from slightly above to slightly below the recommended fats and proteins for a 20-year old male.  (Defs.' Reply to Defs.' PFOFs (dkt. #68) ¶ 72 (citing Berndt-Miles Aff., Ex. 106 (dkt. #61-3) 15-21 (showing daily average of protein and fat for plant-based Ramadan meals as percentage of recommended daily allowances for 20-year old male as ranging from a low of 88% to a high of 119%)).)

Inmates participating in Ramadan receive roughly the same number of calories as those inmates receiving the general institution meal, though the calories are allotted across two meals before sunrise and after sunset, rather than over the typical three meals.

Ramadan meals are delivered in cold bag meals, with the lunch and dinner meals served together in the evening hours. Tatum does not dispute this, but contends that for NOI diet followers, the Ramadan meals contain insufficient calories, fat and protein, largely due to the provision of peanut butter and skim milk, both of which appear to be not prescribed under the NOI diet.

## OPINION

### I.  Motion for Summary Judgment

#### A.  RLUIPA Claim

The relevant portion of RLUIPA provides in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

In recent cases the United States Supreme Court has defined "substantial burden" as something that "seriously violates [one's] religious beliefs," regardless of whether alternative means of religious exercise are available.  *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014)).  The use of the term "seriously" provides little more guidance than "substantial burden," but the Seventh Circuit advises it means more than just a "modest" violation.  *Schlemm v.*

*Wall*, 784 F.3d 362, 365 (7th Cir. 2015).  The Supreme Court has further clarified that the religious exercise includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Holt*, 135 S. Ct. at 860 (quoting 42 U.S.C. § 2000cc–5(7)(A)).  Still, plaintiff must show at least (1) a loss of benefits or (2) that the prison applied pressure to modify behavior.  *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008) (holding that government conduct is substantially burdensome when it "put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs") (internal citations and quotation marks omitted).

If a prisoner satisfies the initial burden of demonstrating something more than "a modest violation," then the burden shifts to the government to demonstrate that the policy is the least restrictive means of furthering a compelling government interest.  *Koger*, 523 F.3d at 796.  For that determination, "[c]ontext matters."  In the application of the "compelling government interest" standard, courts must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures . . . consistent with consideration of costs and limited resources."  *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).  As Justice Sotomayor cautioned in *Holt*, however, this deference "does not extend so far that prison officials may declare a compelling interest by fiat."  *Holt*, 135 S. Ct. at 867 (Sotomayor, J., concurring) (internal quotations omitted); *see also Schlemm*, 784 F.3d at 365 (7th Cir. 2015) ("Saving a few dollars is not a compelling interest, nor is a bureaucratic desire to follow the prison system's rules. The Act requires prisons to change their rules to

14

accommodate religious practices; rules' existence is not a compelling obstacle to change.").

Hence, as is often true with claims of impingement on constitutional rights, district courts are left to apply a balancing test under RLUIPA. Unfortunately, there has yet to be a sufficient number of cases to assess with much confidence how to weigh either side of the scale now that RLUIPA has apparently lowered the threshold on both sides.

### i. Substantial Burden

### a. NOI diet

In order to determine whether Tatum has made a *prima facie* case that defendants' refusal to accommodate his religious diet request constitutes a substantial burden on his religious exercise, the court must first consider Tatum's request. This initial task proves more difficult than perhaps it would appear to be because Tatum seems to have walked back (or perhaps compromised) on the more difficult aspects of his accommodation request in his summary judgment submission, which presents a bit of a moving target for both defendants and the court.[6]

In his original accommodation request, Tatum generally sought a diet consisting of one meal per day, delivered between 4:00 p.m. and 6:00 p.m., with certain specific foods

---

[6] As explained below, Tatum sought a much broader array of foods in his original request and it was his claim based on *that* religious diet which he exhausted by pursuing an administrative remedy. *See Heard v. Caruso*, No. 2:05-cv-231, 2012 WL 951698, at *4 (W.D. Mich. Mar. 20, 2012) (considering claim raised as part of administrative process, finding that plaintiff "failed to exhaust his administrative remedies on this alternate means of accommodating his religion"). Still, consistent with the Seventh Circuit's direction in *Schlemm*, Tatum's willingness to compromise on his original dietary request does not necessarily undermine his claim. *See Schlemm*, 784 F.3d at 365 ("That Schlemm proposed a compromise (ground beef) does not scuttle his claim, any more than Holt's proposed compromise (a short beard) did.").

being either prohibited or required. Starting with the prohibited foods, defendants contend that the current religious diet options available are the most conservative, in other words, cover the most extreme religious requests. The halal or vegan religious diets would satisfy a number of Tatum's requests as part of the NOI diet. For example, both diets exclude pork. Indeed, the vegan diet would exclude all meat. But other prohibited, or at least not recommended, foods appear to be common components of both the halal and vegan diets, like peanuts and other nuts, certain beans, white bread, skim milk, and canned fruit and vegetables.[7]

Defendants' response to this is simple: Tatum need not eat these prohibited foods. Defendants label this option as "self-selection." The principal problem with this option is that Tatum avers that he cannot exclude those foods and still obtain sufficient nutritional value to maintain his health, and defendants do not dispute his averment except for alluding to possible other reasons for his weight loss (e.g., a planned hunger strike). Defendants also contend that Tatum can supplement his diet with items from the canteen or commissary, just as all inmates can. Neither response is very satisfying on summary judgment. The first is just speculation. As for the second, while inmates, perhaps even Tatum (though defendants provide no evidence of Tatum's canteen purchases), may well rely on the commissary or canteen to supplement their diets, defendants have not established as a realistic option under RLUIPA unless (1) funding for purchases is offered by the institution for those who cannot otherwise afford it; *and* (2) the canteen contains appropriate food options.

---

[7] The line between "prohibited" and "not recommended" foods is not entirely clear from Tatum's submissions.

In further support of his claim, Tatum points to Wisconsin Administrative Code DOC § 309.23(5), which provides:

> **(5)** An inmate may abstain from any foods that violate the inmate's religion. Consistent with available resources, staff shall provide a substitute from other available foods from the menu at that meal. The substitution shall be consistent with sub. (1).[8]

Tatum contends that defendants' suggestion that he simply *abstain* from certain offending foods fails to provide for the *substitution* with other foods as contemplated in this administrative provision.  Although a violation of an administrative rule does not necessarily constitute a violation of RLUIPA or the First Amendment, *see Pasiewicz v. Lake Cnty. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001), the court agrees with Tatum that unless the burden is too great, defendants would appear to have an obligation to offer reasonable substitutes for inmates observing an NOI diet from either the halal, plant-based or general diet.

As for required or desired foods, defendants contend that Tatum is essentially seeking "specialized" foods, which is something religious diets "were never designed to provide."  "Rather than offering all religiously or culturally significant or preferred foods," religious diets were designed to allow inmates to obtain full nutrition while abstaining from prohibited foods.  (Defs.' PFOFs (dkt. #59) ¶¶ 61-62.)  Of course, what DOC policy authorizes does not necessarily comport with RLUIPA.  *See Schlemm*, 784 F.3d at

---

[8]  Subsection 1 provides: "The department shall provide nutritious and quality food for all inmates. Menus shall satisfy generally accepted nutritional standards. The sanitation requirements set by the warden at each institution shall be in writing and shall also be satisfied." Wis. Admin. Code DOC § 309.23(1).

365 ("The Act requires prisons to change their rules to accommodate religious practices; rules' existence is not a compelling obstacle to change.")

Regardless, Tatum may certainly challenge defendants' limited view of religious foods under RLUIPA.  While providing a religious diet that excludes prohibited foods is a significant accommodation, and likely satisfies a broad array of religious dietary needs, the Seventh Circuit has already found that RLUIPA may well require institutions to accommodate religious diets by offering specific foods, most notably in the context of a traditional religious feast.  For example, in *Schlemm*, the Seventh Circuit recently reversed an order by this court granting summary judgment to defendants holding, in part, that plaintiff had raised a genuine issue of material fact as to whether defendants' refusal to provide him venison for a religious feast substantially burdened his religious exercise under RLUIPA.  784 F.3d at 365.  Obviously, *Schlemm* may be distinguishable because the plaintiff in that case was seeking specialized food for an *annual* feast, whereas Tatum, here, seeks a specialized diet on a *daily* basis, but that distinction appears only material to the second prong of a RLUIPA claim -- whether the denial of an accommodation is the least restrictive means of furthering a compelling government interest -- and not material to whether the denial of specific religious foods seriously violates Tatum's religious exercise.

Arguably, dividing foods into prohibited and required categories is itself a bit of a false construct.  A lengthy list of prohibited (or perhaps non-recommended) foods effectively suggests a short list of acceptable foods, and those foods (or some subset of them) appear necessary for one observing the NOI diet to obtain sufficient calories, fat

18

and protein.  In his summary judgment materials, Tatum appears particularly fixated on whole milk, navy beans and wheat bread.  Perhaps, supplementing a plant-based religious meal with these three food items would be sufficient to meet Tatum's religious objectives.

Finally, Tatum requests *one* meal per day, served in the late afternoon or early evening, contending that *both* a single meal and the time of that meal are requirements of the NOI diet.  While one could argue that he could simply eat the one evening meal and abstain from breakfast and lunch, defendants do not argue that an evening meal would contain enough calories or nutritional value to maintain his health, and there appears to be no option for him to carry over or otherwise store breakfast and lunch food items until the evening meal.

### b.  Religious Interest

An issue lurking in defendants' submission is whether the NOI diet constitutes or is part of his religious exercise.  Defendants point out that other courts have "found that *How to Eat to Live* and the writings of Elijah Muhammad provide guidance to Nation of Islam adherents on healthy eating, but are not the issuance of a religious mandate to eat in accordance with the book."  (Defs.' Br. (dkt. #58) 8 n.1 (citing cases).)  Unlike in other cases, however, the only evidence in the record of this religious practice is Tatum's own sworn statement that he views the NOI diet as a "religious mandate from a religious leader," which he considers "[n]o different than Musa (Moses) stating Allah (God) taught him the religious diet given to the Children of Isr[ae]l," and that "[m]aintaining religious purity of mind [and] body via diet restrictions is an important [and] obvious religious tenet."  (Tatum Aff. (dkt. #66) ¶¶ 1-2.)  Even so, absent some countervailing

19

opinion -- perhaps from the DOC Chaplain or leader of Islamic services -- the court has no basis for finding at summary judgment that Tatum's NOI diet does not constitute religious exercise or is not a part of his religious exercise. *See also Nelson v.* Miller, 570 F.3d 868, 878-79 (7th Cir. 2009) (holding that religious exercise inquiry focuses on sincerity of individual's belief, not on clergy verification). Indeed, unlike other decisions in which courts have granted summary judgment to defendants on similar NOI diet requests, defendants put forth no evidence challenging the significance of this diet to the Nation of Islam or Tatum's sincerity in seeking to follow the diet. *See, e.g.*, *Ford v. Fed. Bureau of Prisons*, No. 08-cv-00882, 2011 WL 3415890, at \*10 (D. Colo. May 24, 2011) (granting summary judgment to defendants on similar NOI diet accommodation claim because "defendants have demonstrated with unrefuted evidence . . . that the plaintiff does not comply with all of the dietary practices which he claims are essential to his faith"); *Shabazz v. Johnson*, No. 3:12CV282, 2015 WL 4068590, at \* (E.D. Va. July 2, 2015) (granting summary judgment to defendant on NOI diet claim in part because "the evident establishes that, Shabazz, through his own voluntary food selection, fails to make much effort to follow religious diet" and therefore denial of accommodation does not substantially burden his religious exercise).

On the record at summary judgment at least, the court, therefore, concludes that Tatum has put forth sufficient evidence from which a reasonable trier of fact could find that defendants' refusal to accommodate his NOI diet substantially burdens his religious exercise. On the other hand, the evidence is not so overwhelming or one-sided to find in favor or Tatum on this first prong as a matter of law.

### ii.   Further Compelling Interest

Tatum having established for purposes of summary judgment only, a *prima facie* case that the denial of an NOI diet constitutes a substantial burden on his religious exercise, defendants must demonstrate DOC's religious diet policy is the least restrictive means of furthering a compelling government interest, including the denial of Tatum's proposed NOI diet accommodation. *Koger*, 523 F.3d at 796.  In support of their motion for summary judgment, defendants point to three compelling interests to justify their denial of Tatum's NOI diet request:  (1) costs / administrative ease; (2) security; and (3) Tatum's health.  The court need only briefly touch on the latter two issues, finding defendants' offer at summary judgment to be insufficient to meet the heightened standard of RLUIPA.

As for security concerns, it is undisputed that defendants already provide some customization for inmates in the form of three, currently available religious trays, and even further individualization for medical reasons.  Perhaps Tatum's request is so unusual as to open the floodgates to similar, unique requests that would overwhelm DOC's ability to accommodate them, but defendants' concern seems too general and unsubstantiated, especially given the disputed fact issues described below leave unsettled what exactly would be required to accommodate Tatum's requests (assuming Tatum's requests were clear).

As for defendants' concern for Tatum's health, the court finds defendants' nutritional analysis somewhat flawed at this point.  As best as the court can discern, DOC dietician Berndt-Miles constructed NOI diets based on available food, without

21

consideration of whether certain food could be substituted in order to meet nutritional guidelines.  While it may be harder to obtain the minimal nutritional requirements for calories, fat and protein under the NOI diet, Berndt-Miles' constructed diets do not appear to foreclose this possibility, or at least defendants have failed to put forth sufficient evidence with respect to this particular justification to prevail on summary judgment.  If anything, her analysis bolsters Tatum's claim that he cannot follow the NOI diet by self-selecting food from the vegan, halal or general diet trays and still obtain necessary nutritional value.

Like most RLUIPA challenges brought by inmates, Tatum's claim appears to turn on whether defendants' concerns about costs and administrative burdens justifies their denial of his request for a NOI diet.  Not surprisingly, the parties have vastly different views of Tatum's request, as well as the burden on the institution in attempting to accommodate it.  In asserting their position, both parties draw arguably unreasonable inferences.  On the one hand, Tatum contends that his requested diet does not require individualization or specialization because DOC already has the items he wants.  His assumption, however, is flawed in at least two major respects.  First, it is disputed, or at least Tatum has failed to put forth definitive evidence, whether DOC has the foods requested, or even if at times, could be made available to him on a daily basis.  Second, Tatum fails to acknowledge the need for, much less practicality of, coordinating the preparation and serving of a meal that differs from the general or religious diet trays.

On the other hand, defendants' position has its own flaws.  In describing significant, various problems posed by Tatum's request, defendants fail to distinguish

adequately Tatum's claimed dietary needs from certain dietary needs already being accommodated for health reasons.  If CCI and other institutions within DOC are able to customize meals for medical reasons, why would Tatum's religious dietary needs pose the extreme burden suggested by defendants' proposed facts?  Even more problematic, defendants' claim that the denial of Tatum's NOI diet request furthers compelling administrative and costs interests is largely premised on a scenario in which most, or at least a material minority, of DOC's 22,000 other inmates will make similar dietary requests to Tatum's, while only 1.6% of those inmate have currently requested a religious meal tray option.

While the court has no reason to doubt Williard-West's lengthy list of religious food requests, the list alone does not undermine Tatum's request for an accommodation, assuming that the denial of the diet is a substantial burden on his religious exercise.  In other words, the DOC cannot rely on the fact that there are a number of religions, each with its own set of unique traditions, to relieve its obligations under RLUIPA.  Assuming that an inmate can demonstrate a substantial burden on his or her religious exercise -- an important check that remains to be proven by plaintiff at trial -- defendants must demonstrate that the denial furthers a compelling government interest with the least restrictive means with more than generalized concerns about a "snowball effect" or "slippery slope."   *See Schlemm*, 784 F.3d at 366 ("On this record the cost of accommodating Navajo inmates appears to be slight, and the costs of accommodating other inmates' requests (should any be made) can be left to future litigation.").  While a reasonable fact finder may well conclude that defendants have met their burden, the

court does not find the record at summary judgment so one-sided to foreclose a finding in Tatum's favor.

## B. First Amendment Free Exercise Claim

Tatum was also granted leave to proceed on a First Amendment free exercise clause.  Like his claim under RLUIPA, to establish a First Amendment violation, plaintiff must demonstrate that defendants' denial of an NOI diet "placed a substantial burden on his religious practices." *Thompson v. Holm*, No. 15-1928, 2016 WL 29047, at *3 (7th Cir. Jan. 4, 2016).  As defendants point out in their brief in support of summary judgment, the "substantial burden test remains an element that must be proven by inmate plaintiffs to substantiate both a First Amendment free exercise claim and a claim under RLUIPA." (Defs.' Br. (dkt. #58) 18.)  For reasons already explained above (*see* discussion, *supra*, Opinion § I.A.i), plaintiff has put forth sufficient evidence from which a reasonable fact finder could conclude that the denial of an NOI diet substantially burdened his religious exercise.

While the substantial burden prong of a First Amendment claim generally tracks that of a RLUIPA claim, although perhaps with somewhat less rigor, the claims diverge on the second element.  As described above, after a plaintiff has made out a prima facie case that the challenged act substantially burdens his religious exercise under RLUIPA, the burden then shifts to the defendant to demonstrate that the denial is the least restrictive means of furthering a compelling government interest.  *Koger*, 523 F.3d at 796. Under the First Amendment claim, however, the burden not only remains with Tatum, but he must demonstrate that the burden on his rights is "not reasonably related to a

legitimate penological interest." *Thompson*, 2016 WL 29047 at *3 (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)).

For purposes of analyzing plaintiff's First Amendment claim, this difference is material.  As set forth in the findings of facts, plaintiff has failed to offer sufficient evidence to create a genuine issue of material fact that the denial of his NOI diet as described in Tatum's religious diet accommodation requests was not reasonably related to a legitimate interest of administrative ease, including controlling costs, offering straightforward diets that can be consistently prepared by less than skilled staff, and satisfying nutritional needs, food preferences and religious beliefs of a large, diverse prison population.

Even if Tatum had put forth sufficient evidence to raise a genuine issue of material fact as to the second prong of his First Amendment claim, defendants would be entitled to qualified immunity because it is not clearly established that the defendants' denial of an NOI diet violate his First Amendment rights, especially in light of the fact that DOC already offered three religious, among other, diet options from which he could self-select food consistent with his NOI beliefs.  *See Pearson v. Callahan*, 555 U.S. 223, 233-42 (2009); *see also Easterling v. Pollard*, No. 12-1532, 528 F. App'x 653, 658 (7th Cir. July 22, 2013) (unpublished) (finding defendants entitled to qualified immunity in First Amendment religious diet case after recognizing that "This issue of religious discrimination in prison poses one of the knottiest problems in First Amendment jurisprudence, since prison officials face significant challenges in maintaining security and safety, as well as substantial constraints on budget and staffing, and balancing these

concerns with a wide range of religious practices can be daunting."). Because of the absence of a clear legal right under the First Amendment to accommodation of Tatum's *specific* requests for preferred foods on a daily basis, rather than simply providing a variety of religious and other diet options, which excludes or allows him to self-select away from prohibited foods, such as pork, the court will grant defendants' motion for summary judgment on that claim.

## II. Remaining Issues

Under RLUIPA, plaintiff is limited to declaratory and injunctive relief. *See Nelson v. Miller*, 570 F.3d 868, 886-89 (7th Cir. 2009) (monetary damages are not available as a remedy under RLUIPA). With plaintiff's First Amendment claim now out, this means the only available relief to Tatum is equitable in nature. As such, he has no right to a jury trial. *See Kramer v. Banc of Am. Securities, LLC*, 355 F.3d 961, 966 (7th Cir.2004) ("There is no right to a jury where the only remedies sought (or available) are equitable.").

The court, therefore, will hold a bench trial on Tatum's remaining RLUIPA claim. *See* Fed. R. Civ. P. 39(a)(2) (The trial on all issues so demanded must be by jury unless . . . the court, on motion or on its own, finds that on some of all of those issues there is no federal right to a jury trial."). The court will hold a telephonic scheduling conference on February 10, 2016, at 10:00 a.m. to establish remaining pre-trial deadlines and set a trial date.

There are two other motions before the court, both by Tatum. First, Tatum seeks appointment of an expert to provide testimony on the nutritional adequacy of the DOC's

Ramadan meals.   (Dkt. #56.)   The court will address this motion at the telephonic scheduling conference.   Second, in a recent letter to the court, Tatum advises the court that DOC staff have confiscated legal mailings in other cases.   (Dkt. #73.)   The court will also explore any issues with Tatum's legal materials as it impacts this case in the scheduled telephonic conference.[9]

ORDER

IT IS ORDERED that:

1) plaintiff Robert Tatum's motion for partial summary judgment (dkt. #50) is DENIED;

2) plaintiff's motion "for final order for plaintiffs to 'stand on the complaint' and motion for this decision to be held in abeyance" is DENIED as moot;

3) defendants Michael Meisner and Cathy Jess's motion to strike plaintiff's motion for partial summary judgment (dkt. #53) is DENIED as moot;

4) defendants' motion for summary judgment (dkt. #57) is GRANTED IN PART AND DENIED IN PART.   Judgment is granted in favor of defendants on plaintiff's First Amendment claim.   Summary judgment is denied with respect to plaintiff's RLUIPA claim;

5) the court RESERVES on plaintiff's motion to appoint expert (dkt. #56) and plaintiff's letter to the court concerning confiscation of legal materials (dkt. #72); and

---

[9] Tatum remains free to renew his motions for class certification and for assistance in recruiting counsel, though the court views both motions as unlikely to succeed.   The record at summary judgment suggest that Tatum's so-called NOI dietary accommodation request is unique to him, notwithstanding underlying roots to the Nation of Islam, and therefore not suitable for class treatment.   Moreover, Tatum's demonstrated ability to prosecute his claims to date, coupled with the fact that this matter will proceed to a trial to the bench, it is unlikely that Tatum will need the assistance of counsel.

6) on February 10, 2016, at 10:00 a.m., the court will hold a telephonic scheduling conference to establish remaining pre-trial deadlines and set this case for a bench trial.  Defendants to establish call to chambers at 608-264-5087.

Entered this 26th day of January, 2016.

BY THE COURT:


/s/
_____
WILLIAM M. CONLEY
District Judge