IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ROBERT TATUM, and all similarly situated
DOC/CCI Inmates,

                              Plaintiff,                        OPINION AND ORDER

        v.
                                                                13-cv-44-wmc
MICHAEL MEISNER and CATHY JESS,

                              Defendants.

While incarcerated by the Wisconsin Department of Corrections ("DOC"), plaintiff Robert Tatum requested a nutritionally adequate diet in line with the Nation of Islam ("NOI") diet espoused in Elijah Muhammad's book, *How to Eat to Live*. After denying defendants Michael Meisner and Cathy Jess's motion for summary judgment on plaintiff's claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-2(b), a trial to the court was held to resolve two, disputed material facts: (1) whether Tatum has made a *prima facie* case that the denial of a NOI diet substantially burdened his religious exercise; and (2) if so, whether that denial was the least restrictive means of furthering a compelling government interest.

In this opinion, the court finds that defendants substantially burdened Tatum's religious exercise in violation of RLUIPA by denying him a religious diet, and the denial was not the least restrictive means of furthering compelling interests. Accordingly, the court will enter an injunction as set forth in the order below, which requires the Department of Corrections to provide Tatum with a single, daily nutritionally adequate NOI diet, consistent with Trial Exhibits 503a and 503b. This opinion also addresses

several, post-trial motions filed by Tatum, including a motion to reconsider the court's denial of damages and a motion for reconsideration of class treatment. For the reasons explained below, however, the court will deny these motions.

OPINION

## I. Liability as to RLUIPA Claim

The court previously issued an opinion and order on the parties' cross-motions for summary judgment, which set forth undisputed facts and the law governing plaintiff's claims. Rather than repeating much of that opinion, the court incorporates those facts and law for context, limiting this opinion to resolution of the disputed, material facts.

Here, Tatum pursues a claim under RLUIPA's substantial burden provision, which states in pertinent part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

### A. Substantial Burden

The United States Supreme Court has defined "substantial burden" as something that "seriously violates [one's] religious beliefs," regardless of whether alternative means of religious exercise are available. *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (quoting

2

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014)). A serious violation is something more than just a "modest" violation. *Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015). The Supreme Court has further clarified that this includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Holt*, 135 S. Ct. at 860 (quoting 42 U.S.C. § 2000cc–5(7)(A)). Still, "[b]ecause RLUIPA is a guarantor of sincerely held religious beliefs, it may not be invoked simply to protect any 'way of life, however virtuous and admirable, . . . if it is based on purely secular considerations.'" *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). In addition to showing that his desire to follow the NOI diet is religiously based, plaintiff must also show at least (1) a loss of benefits or (2) that the prison applied pressure to modify his behavior. *Koger*, 523 F.3d at 799 (holding that government conduct is substantially burdensome when it "put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs") (internal citations and quotation marks omitted).

At trial, Tatum testified that he has been a strict adherent of the NOI diet for over twenty years. Before his incarceration, he described a typical daily diet consisting of a single meal of navy beans or lentils, vegetables, often in a soup, fresh fruits, whole milk, and whole bread or farina. During earlier stints at the Milwaukee County jail and at a mental health facility, Tatum further testified about his efforts to secure a nutritionally adequate NOI diet. When transferred to state custody in 2011, Tatum again requested a religious diet at his intake interview. Specifically, he continued to press for an NOI diet while an inmate at Columbia Correctional Institution ("CCI"), seeking support from CCI

chaplains, other CCI employees and central office DOC administrators. These ongoing efforts culminated in his filing this lawsuit.

Tatum also testified to going on hunger strikes. Both medical records and the testimony of Dr. Hoftiezer substantiated his testimony, although there appears to be some question as to whether Tatum engaged in hunger strikes to protest the denial of an NOI diet, or because he believed staff was tampering with his food. Regardless, the court credits the sincerity of Tatum's religious beliefs and long-standing adherence, and attempts at adherence, to the NOI diet. While not a requirement under RLUIPA, Tatum's testimony also established his sincere belief that: (1) the NOI diet was a core or central element of his religious exercise generally, and (2) the diet espoused in *How to Eat to Live* by Elijah Mohammad was mandated by Allah specifically. Elijah Muhammad, *How to Eat to Live Book 1* pp.8, 53 (Secretarius MEMPS Publications 1967) (describing the "eating regulations" as a "must;" stating that the diet came from Allah).[1]

Defendants nevertheless challenged Tatum's sincerity by identifying several, repeat canteen purchases that appear not to be in compliance with his NOI diet, including Ramen noodles, Twix bars, chips and cookies. As Tatum testified, however, the fact that he purchased these items did not necessarily mean that he consumed them. Instead, Tatum testified that he either traded certain items for services, *e.g.*, hair braiding, or avoided eating prohibited portions of the goods, *e.g.*, the flavor pack with the Ramen

---

[1] The fact that Nation of Islam may be seen as an unconventional off-shoot of more mainstream Islamic sects does not undermine plaintiff's claims. *See Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005) (holding that a person's religious beliefs "need not be based on . . . a mainstream faith," but rather should be the beliefs "dealing with issues of ultimate concern that for her occupy a place parallel to that filled by . . . God in traditionally religious persons") (citations and quotation omitted).

noodles.  Tatum also testified that he did not personally view certain of these foods as problematic, directing the court to passages from *How to Eat to Live* in which NOI practitioners were cautioned to not make a meal out of sweets or eat them every day, but not required to avoid them altogether.  *How to Eat to Live Book 1* at p.30.  Regardless, as the court observed at trial, occasional lapses from strict compliance with the NOI diet does not undermine a finding of Tatum's sincerely held religious belief, especially in light of the undisputed length of his practice and his consistent and pronounced efforts to maintain an NOI diet while incarcerated.[2]

Having found that Tatum's efforts to comply with the NOI diet constitute religious exercise, the court must consider whether defendants' denial of the requested NOI diet constitutes a substantial burden.  Here, too, the question is not a close one.  As defendants conceded at trial the option that Tatum "self-select" NOI-compliant foods from either the general diet or a religious diet (e.g., halal or plant-based) would not meet his basic nutritional needs.  In particular, DOC's dietary services director Christine Berndt-Miles testified that if Tatum were not to eat NOI-prohibited foods, the general diet menu would not meet his nutritional needs, including sufficient calories and key nutrients, resulting in serious under nutrition and a lack of energy.  Indeed, during the

---

[2] Consistent with this court's understanding at summary judgment, Tatum's trial testimony regarding a claim specific to Ramadan is tied to his more general concerns about the lack of an NOI-compliant diet.  While the court credit's Tatum's testimony that the diet provided by DOC during Ramadan is even more taxing than the diet served during the rest of the year, there is no separate RLUIPA challenge to the Ramadan meal.  In other words, an injunction requiring defendants to provide Tatum with an NOI diet during all times, including during Ramadan, would address any RLUIPA challenge to the Ramadan diet.

course of this lawsuit, in response to Tatum's weight loss and low body mass index

("bmi"), Tatum was placed on two versions of a high caloric ("DM 327") diet.[3]

In their post-trial brief, defendants argue that individualized meal planning is not

required under RLUIPA, directing the court to a case out of the Eastern District of

Wisconsin, *Andreola v. State of Wis.*, No. 04-C-282, 2006 WL 897787 (E.D. Wis. Apr. 4,

2006). *Andreola* is readily distinguishable. As an initial matter, the section relied on by

defendants concerned that plaintiff's claims under the *First Amendment*. Moreover, the

court found the logistical and budgetary problems associated with his request for a

separate kosher kitchen were "obvious," resulting in its holding that plaintiff's First

Amendment claim failed to meet the *Turner v. Safley*, 482 U.S. 78 (1987), standard.

Finally, even on this fairly outlandish claim, the district court allowed the plaintiff in

*Andreola* to proceed to trial on his RLUIPA claim.[4]

Still, the court agrees with the general proposition that a prison need not

accommodate every exercise of an inmate's faith, however sincerely held. In this case, the

prison's proposed accommodation -- that Tatum adhere to the NOI diet on the general

meal plan or one of the existing religious meal plans -- is not feasible. Indeed, there is no

---

[3] Without contradiction, Tatum testified that CCI's warden ordered this modified diet, which appears to provide enough calories and nutritional value to meet his health needs while still avoiding prohibited foods during the pendency of this case.

[4] Defendants also cite to the unpublished Seventh Circuit's decision in *Andreola*. While that court upheld the district court's ultimate verdict against the plaintiff on his RLUIPA claim, it did so based on a finding that defendants' refusal to allow the plaintiff to prepare his own meals in a kosher kitchen was the least restrictive means of furthering a compelling interest in security. *Andreola v. Wis.*, 411 F. App'x 495, 498-99 (7th Cir. 2006). As described below, Tatum's request here does not implicate the costs, practical problems *or* security concerns presented in *Andreola*.

dispute that Tatum cannot achieve sufficient nutritional value from so-called self-selection.

As the court indicated at summary judgment, while defendants denied Tatum's request for an NOI diet, he has presented something of a moving target in describing his exact needs. Part of the difficulty is because the book on which he relies is not a model of clarity. Even when testifying at trial, Tatum waffled at times as to whether a certain item of food was acceptable. For example, when questioned as to whether bread made of wheat *and* white flour would be acceptable, he initially indicated that it would, but then testified that it would not because whole wheat is specified in *How to Eat to Live*. At least at times, Tatum also testified that he could drink whole milk, regardless of whether it was homogenized or not, perhaps an inconsistent reading of the strict guidelines presented in the book.

Still, during the course of this case and in particular during trial, two key components of Tatum's religious exercise have been consistent: (1) one meal a day, which Tatum described as one of the most important tenets of the NOI belief system; and (2) the lengthy list of prohibited foods necessarily requires the provision of certain preferred foods to meet minimum nutritional requirements. As explained at the close of trial, the court finds that plaintiff has met his burden of proof that defendants' denial of these two basic requirements constitutes a substantial burden on his religious exercise.

### B. Least Restrictive Means

Having found that Tatum proved sincere and serious impingement on his religious exercise, the burden then shifts to defendants to prove that the impingement is the least

restrictive means of furthering a compelling government interest. *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). For that determination, "[c]ontext matters." *Id.* In the application of the "compelling government interest" standard, courts must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures . . . consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). As Justice Sotomayor cautioned in *Holt*, however, this deference "does not extend so far that prison officials may declare a compelling interest by fiat." *Holt*, 135 S. Ct. at 867 (Sotomayor, J., concurring) (internal quotations omitted); *see also Schlemm*, 784 F.3d at 365 (7th Cir. 2015) ("Saving a few dollars is not a compelling interest, nor is a bureaucratic desire to follow the prison system's rules. The Act requires prisons to change their rules to accommodate religious practices; [those] rules' existence is not a compelling obstacle to change.").

During the course of trial, the defendants here presented three core obstacles for accommodating Tatum's religious exercise: (1) nutritional concerns about the NOI diet; (2) logistical concerns in serving one meal a day and of serving NOI-compliant (specifically, perishable) foods; and (3) security concerns in providing Tatum with perceived special treatment. The court addresses each in turn below, finding that these concerns do not justify the denial of an NOI diet outright. In other words, the court concludes that defendants failed to prove the denial of an NOI diet was the least restrictive means of furthering a compelling government interest.

At summary judgment, the court was critical of the nutritional analysis originally conducted by defendants. At trial defendants conceded that their initial analysis was incorrect, or at least, too limited. While other religious diets provided enough calories and nutritional value to allow inmates to self-select them while still receiving sufficient nutritional and caloric intake, such an option is not available to Tatum given the extensive restrictions in the NOI diet. Indeed, defendants conceded that Tatum would only receive 1100 calories per day if he were provided a diet following the DOC's initial plan, which would simply have removed prohibited foods without any supplementation. At trial, defendants offered evidence, particularly through DOC dietary directory Berndt-Miles's testimony describing a nutritionally sound diet, which would involve: (1) taking the existing plant-based or vegan meal plan, (2) relying on the BOP guidelines and/or the DOC's own analysis to further limit the diet in compliance with *How to Eat to Live*, and (3) increasing the portions of these approved or preferred foods.

As alluded to at the outset of this opinion, defendants specified two menus detailed in trial exhibits 503a and 503b both containing sufficient calories and nutritional value based on foods that are permitted under the NOI diet, with a few minor exceptions. In addition, the 503a meal plan also includes a liquid dietary supplement, Boost®. Despite some concerns about preservatives and nonhomogenized milk, Tatum testified at trial that Boost® *was* NOI-compliant, because it has the Muslim symbol and contains whole milk. From these exhibits, the evidence supports a finding that defendants are able to craft a diet out of foods already purchased by the DOC or readily

available.[5]    Moreover, while defendants were initially concerned about the health implications of eating only one meal a day, defendants conceded at trial that the average healthy individual would suffer no adverse health effects from eating only once per day after consultation with DOC's medical director, Dr. Burnett,.

Defendants next raised various logistical concerns.  For example, defendants offered evidence that if Tatum were transferred back to the general population, allowing him to eat his one meal in the dining hall with other inmates would be too difficult to accommodate given the time he would need to eat his daily food provision at one sitting. While the court credits this concern, defendants again acknowledged at trial that an NOI-compliant meal could be provided in its entirety or in part to his cell.  Defendants also acknowledged that a supplement bag or tray delivered to his cell with the dinner meal would be workable.  Indeed, bag meals are routinely provided to an inmate's cell to accommodate their specific medical needs (*e.g.*, diabetes) or various religious exercises (*e.g.*, Ramadan).

Understandably, defendants further expressed concerns about the proverbial slippery slope, a concern that this court is not unsympathetic too, but Congress obviously discounted in passing RLUIPA in the first place.  While Tatum's requests may not overly tax CCI's storage capabilities for fresh food, for example, defendants express concerns about additional requests being made by other inmates.  Even if this is a legitimate defense under RLUIPA, defendants offered no evidence that there are likely other inmates requesting such a diet.

---

[5] In so finding, the court is not diminishing the extra effort required to meet Tatum's request for a NOI diet, only that defendants' testimony at trial indicated that it was "workable."

Regardless, the crafted injunction below is just as to Tatum. The DOC may provide this diet to other inmates, but is certainly not required to do so, especially without evaluating whether the request is motivated by a sincerely held religious belief. Moreover, if a significant number of NOI adherents or individualized, religious meal requests come out of the woodwork, and some tipping point is reached, the DOC may, at that time, evaluate whether the denial of the NOI diet is the least restrictive means of furthering a compelling interest in prison administration or seek guidance from a court.

For the same reason, concerns about equitable allocation of prison financial resources do not appear to be implicated by Tatum's request for an individual accommodation. As described at trial, most of the food on the NOI-compliant proposed diets is already provided to specific inmates. Additionally, consistent with the Seventh Circuit's interpretation of RLUIPA, defendants acknowledged that cost was not a concern.

Finally, defendants raised security concerns with accommodating Tatum's request. Specifically, defendants are concerned that other inmates may notice Tatum's special treatment. As discussed above, however, a variety of inmates already receive different food than others for medical or religious reasons. Defendants also conceded, namely through the testimony of Brian Foster, the Warden of Waupun Correctional Institution, that there were no known issues because of, for example, an inmate's receipt of double portions or other food accommodations. Absent some examples, and in light of the wide variety of diets, the court is, therefore, restrained from crediting defendants' hypothetical security concerns, at least after RLUIPA. Moreover, the NOI diet is so limited and

generally unattractive, both in terms of only eating once per day and the permitted items, that the court is skeptical a sufficient number of inmates would view this attention as favorable treatment. Even if they did, this might be additional evidence of the religious justification for the program.[6]

Accordingly, the court finds that defendants have not met their burden of demonstrating that the denial of an NOI-compliant diet is the least restrictive means of furthering a compelling government interest. While finding a violation of RLUIPA's substantial burden provision, the court also recognizes that the NOI diet generally and Tatum's demands in particular were not models of clarity, that the requirements under RLUIPA are difficult to determine and implement for already overburdened correctional institutions, and that defendants and other DOC officials acted in good faith in attempting to meet Tatum's needs.

## C. Injunction

Having found a violation of RLUIPA, the court will enter an injunction that requires defendants to provide Tatum with an NOI diet consisting of two core parts: (1) a 28-day menu plan of NOI-compliant foods meeting sufficient nutritional value; and (2) provided as a single meal per day to be served in the late afternoon or early evening hours.

---

[6] The court is not wholly discounting the possible other problems that might arise when this injunction is instituted. For example, a wave of individualized food requests or, if the court were to allow Tatum to take food back to his cell and eat the rest of it there, attracting the scrutiny of other inmates, but as described below, the court rejects such particularized accommodation.

At trial and in their post-trial brief, defendants presented two, one-week sample NOI diet menus. Exhibit 503a represents a "sample menu based on the strictest interpretation of the NOI diet that Corrections believed it could accommodate within the limitation of its food service ordering and storage limitations." (Defs.' Post-Trial Br. (dkt. #122) 9.) As previously noted, Exhibit 503a includes the Boost supplement drink. Exhibit 503b is a sample menu with a "wider variety of foods frequently offered by Corrections," and consistent with the federal Bureau of Prisons summary of NOI diet tenets. (*Id.*) While Tatum may have acquiesced to that diet in prior exchanges with defendants, he argued at trial that certain items in the 503b diet were unacceptable (namely, peanut butter, pinto beans and skim milk). In his post-trial brief, Tatum reiterated that any prior acceptance of the 503b was a mistake. (Pl.'s Post-Trial Br. (dkt. #126) 3.)

Still, if the court enters an injunction, defendants request flexibility to use both of the sample weekly menus to create a "rotating 28 day menu cycle for Tatum [that] can provide some limited variety to him, maximize the nutritional sufficiency of the food provided, and allow for anticipated variations in product availability, costs and food delivery experienced in the prison food service program." (Defs.' Post-Trial Br. (dkt. #122) 10.) In response, Tatum again argues that the 503b diet is not NOI compliant and proposes a diet that is "similar to 503(a)." (Pl.'s Post-Trial Br. (dkt. #126) 5.) Curiously, Tatum's focus appears to be on requiring the DOC to modify the halal religious diet to accommodate his NOI diet needs. While this may be a sensible approach, the court is not going to require the DOC to modify its standard halal diet

13

significantly to accommodate one (or perhaps, a few) NOI adherents. Instead, the DOC is simply required to construct a diet that meets Tatum's NOI and nutritional needs in a single, daily meal, regardless of whether it more broadly meets the needs of Muslims following the halal diet.

With the exception of the three foods in the 503b diet credibly identified by Tatum as religiously unacceptable -- peanut butter, pinto beans and skim milk -- the court will direct defendants to create and adhere to a nutritionally-adequate 28-day meal plan based on those foods identified in 503a *and/or* 503b. Consistent with Tatum's testimony at trial and his proposed seven-day menu in his post-trial brief, the diet can include Boost. While Tatum requests that the court order defendants to consult with Tatum and allow his input on food items and dishes (Pl.'s Post-Trial Br. (dkt. #126) 6), he has already provided the input to which he is entitled under RLUIPA during this case, in particular through his testimony at trial and post-trial briefing, and no further input or involvement is required.[7]

As detailed in the order below, therefore, defendants should create and file a 28-day menu consistent with this opinion within three weeks of the issuance of this order. Moreover, within four weeks of the issuance of this order, the court will further require defendants to accommodate Tatum's request to eat only one time per day consistent with this opinion, in the late afternoon or early evening hours. Assuming an injunction were

---

[7] Frankly, given the difficulty in pinning Tatum down as to his beliefs, as well as ongoing, mutual mistrust and miscommunication between the parties, the court also doubts further "consultation" will be productive in any event.

entered, defendants appeared more than capable at trial, and in their post-trial briefing, of accommodating.

The one sticking point, however, concerned *where* Tatum would eat his meal if he were to be released from restricted housing. While housed in segregation, Tatum receives his daily meal in his jail cell, just like other inmates. If part of the general population, however, Tatum would generally eat in the dining hall with his fellow inmates. Since the usual allotted dinner time is a 20-minute period, Tatum would likely not have sufficient time to finish his lone daily meal. In their post-trial brief, defendants argue persuasively that the method or location of meal delivery falls outside of the scope of relief under RLUIPA. While the court will provide defendants significant latitude to sort out the logistics, particularly as it involves security concerns, defendants should be mindful that the accommodation itself neither works a punishment, nor poses a substantial burden on Tatum's religious practice. Specifically, requiring Tatum to eat in his cell, away from normal group dining opportunities, could be viewed as punishment and place pressure on Tatum to modify his behavior and violate his beliefs. As such, the court will order that defendants generally allow Tatum to eat a portion of his daily meal in the dining hall if he is housed in the general population, with the other portion to be delivered to Tatum in his cell within one hour of his meal in the dining hall.

Finally, at trial and in his post-trial briefing, Tatum voiced significant concerns about (1) staff tampering with his food and (2) the DOC complying with an injunction issued by this court. The court is disinclined to anticipate bad faith by anyone at DOC

going forward, and indeed, anticipates full compliance in good faith. If Tatum's concerns come to pass, he may, of course, seek further relief from this court.

## II. Motion to Reconsider Damages Award

After entering judgment in defendants' favor on Tatum's First Amendment claim and rejecting his theory that damages were available under RLUIPA, Tatum seeks another avenue for extending his remedies to include monetary relief. In a motion for a bi-furcated trial and an award of damages, plaintiff seeks to assert an Eighth Amendment deliberate indifference claim based on the denial of adequate nutrition over a several year period of time. (Dkt. #121.)[8]

As the court explained in a prior order, plaintiff's original complaint set forth five different lawsuits, ranging from the denial of an adequate religious diet to a tort claim based on a release account policy, and including a denial of medical treatment related to inadequate diet in violation of the Eighth Amendment. (9/30/13 Op. & Order (dkt. #11) 10-11.) In that opinion and order, the court explained that plaintiff's complaint did not comply with Federal Rule of Civil Procedure 20. The court also explained to Tatum that he must select one of these lawsuits to which to apply the filing fee, and then could opt to bring one or more of these other lawsuits, each by filing its own, separate lawsuit, including a separate filing fee.

While plaintiff disagreed with the court's analysis -- and filed several motions for reconsideration, as well as failed to comply with the court's deadline for selecting a

---

[8] In the first motion Tatum filed, he also sought return of legal materials. The court already addressed this issue in a prior order. (*See* dkt. #125.)

lawsuit (dkt. ##12, 14, 15) -- Tatum ultimately chose to pursue his First Amendment and RLUIPA claims in this case, and the court accepted his belated selection. (9/16/14 Op. & Order (dkt. #22).)

With that in mind, Tatum may still bring an Eighth Amendment claim in a separate lawsuit, but the court will not allow Tatum to reassert that claim near the end of this lawsuit.[9]   Regardless, the record established at trial amply demonstrated that defendants attempted to provide adequate nutrition by placing Tatum on a high calorie diet, and that at least some of Tatum's issues with maintaining an adequate weight were self-inflicted during his hunger strikes. Accordingly, the court will deny this motion.

## III. Class Certification

Finally, Tatum seeks reconsideration under Federal Rule of Civil Procedure 54(b) of this court's cursory review of his original request for class certification, allegedly based on newly discovered evidence (a handful of other inmates who may also be interested in an NOI diet). (Dkt. #131.)  In a footnote in the summary judgment opinion, the court noted that "Tatum remains free to renew his motion for class certification and for assistance in recruiting counsel, though the court views both motions as unlikely to succeed." (1/26/16 Op. & Order (dkt. #75) 27 n.9.)  Specifically, with respect to the class certification request, the court explained further that "[t]he record at summary judgment suggest[s] that Tatum's so-called NOI dietary accommodation request is

---

[9] Similarly, Tatum's filings requesting relief from this court due to DOC staff's purported tampering with his food, Tatum's placement on a pen and paper restriction and further allegations about mail tampering and phone restrictions (dkt. ##139, 140, 146, 153, 154) are issues that fall outside of the scope of this lawsuit. Tatum is free to file other complaints concerning these allegations, but the court will not take them up here.

unique to him, notwithstanding underlying roots in the Nation of Islam, and therefore not suitable for class treatment." (*Id.*)  Regardless, Tatum failed to take the court up on either invitation timely, waiting instead until after trial to seek class certification.

In support of this motion, Tatum submits affidavits from fellow inmates, expressing an interest in the NOI diet.  (Dkt. ##135-138.)  From this, Tatum states, without any support, that "normally 5 or more persons in an action can satisfy the numero[]sity requirement."  (Pl.'s Mot. (dkt. #135) 1.)  Not true.  "While there is no magic number that applies to every case," a forty-member class is typically considered the threshold to meet the numerosity requirement.  *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 860 (7th Cir. 2017) (affirming denial of class certification in part because proposed class of 29 inmates did not meet numerosity requirement).  More fundamentally still, the court's finding of liability here and the crafting of a remedy was very much based on the *individualized* inquiry into both (1) the sincerity of *Tatum's* religious beliefs and (2) *Tatum's* ability to adhere to *his* practice of the NOI diet based on the content and nutritional value of the general diet or other religious (i.e., halal or plant based) diet.  Those inquiries are not amenable to class treatment even if numerosity were somehow satisfied.  Accordingly, plaintiff's motion for reconsideration of the denial of class certification will also be denied.

ORDER

IT IS ORDERED that:

1) Plaintiff Robert L. Tatum has proven that defendants violated his rights under RLUIPA by failing to accommodate his request for a Nation of Islam diet.

2) The court enters the following permanent injunction:

  a) No later than October 17, 2017, defendants shall create and file a 28-day NOI compliant menu consistent with the foods outlined in Trial Exhibits 503a and 503b, but not including peanut butter, pinto beans and skim milk.

  b) No later than October 24, 2017, defendants shall begin to provide plaintiff with an NOI-diet consisting of a single meal per day, served in the late afternoon or early evening hours. Defendants may include a liquid dietary supplement, Boost®, as part of the approved diet.

  c) This meal may be served in accordance with defendants' good faith application of CCI's internal rules and procedures, including security concerns, if any. If plaintiff is housed in the general population, however, he should generally be provided the opportunity to eat a portion of his daily meal in the dining hall, and the remaining portion of the meal should be delivered to his cell within one hour of that meal.

3) Plaintiff's motion for Rule 54(c) FRCP request for bifurcated trial re: damages on undisputed facts (dkt. #121) is DENIED.

4) Plaintiff's motion for reconsideration of class certification denial based on newly discovered evidence (dkt. #131) is DENIED.

5) Plaintiff's emergency motion for hearing (dkt. #139), motion for emergency video conference hearing and request for sanctions (dkt. #140), motion for relief / final order / sanction (dkt. #146), response to deputy clerk (dkt. #153), and complaint about e-filing and mail thefts (dkt. #154) are DENIED.

6) The clerk of court is directed to enter judgment consistent with this opinion and order and close this case.

Entered this 26th day of September, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge